UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LAWRENCE KADISH, by his attorney-in-fact, CHARLES
KADISH, and FIRST FISCAL FUND CO., LLC,

                                    Plaintiffs,

                  -against-

WILLIAM KADISH,

                                    Defendant.
------------------------------------------------------------------------X

Case No.: 2:26-cv-1461

**COMPLAINT**

***Jury Trial is Demanded***

Lawrence Kadish, by his attorney-in-fact, Charles Kadish ("Lawrence") and First Fiscal Fund Co., LLC ("First Fiscal") (jointly, "Plaintiffs"), by their attorneys, Meltzer, Lippe, Goldstein & Breitstone, LLP, as and for their Complaint against Defendant, William Kadish ("William"), allege as follows:

## NATURE OF THE ACTION

1. Lawrence is a 92-year-old individual who, over the past six decades, has built a highly successful real estate empire.

2. From approximately 2016 through 2025, Lawrence and his son, William, each held a 50% membership interest in a real estate acquisition and development entity, Broad Metro LLC ("Broad Metro" or the "Company").

3. One of Broad Metro's most significant development projects is Stadium Trace Village in Hoover, Alabama, a multi-use arts, entertainment, and lifestyle venue comprising approximately 305,000 square feet.

4.      Between approximately 2016 and 2025, Lawrence—through First Fiscal, of which he is the beneficial owner—contributed approximately $25.8 million to Broad Metro, at William's request (the "FF Funds").

5.      Upon information and belief, since approximately 2021, William procured many of the FF Funds under false pretenses by misrepresenting to Lawrence that they were necessary to support Broad Metro's property acquisition and development activities.

6.      In reality, William submitted monthly check requests to Lawrence for FF Funds, many of which were made under the guise of funding projects relating to Broad Metro, but which were actually used by William to finance his personal expenses wholly unrelated to Broad Metro, including personal legal expenses, and, upon information and belief, the repayment of substantial debts and personal loans.

7.      Upon information and belief, despite being a 50% owner, William contributed no funds of his own to Broad Metro.

8.      In or about September 2025, when Lawrence was 92-years-old and in frail health while recovering from pneumonia, William pressured him into agreeing to transfer his 50% membership interest in Broad Metro to William (the "Transaction").

9.      Lawrence was given no meaningful opportunity to conduct due diligence concerning the value of Broad Metro or its assets, nor to consult with legal or tax advisors.

10.     As a result of this pressure, Lawrence signed an agreement to relinquish his membership interest to William for only $17.5 million, which was far below the $25.8 million in FF Funds Lawrence had (through First Fiscal) contributed to Broad Metro, and did not account for the additional value of Broad Metro's real estate holdings, then in various stages of development.

11. The Transaction's terms were further skewed in William's favor. William presented and caused Lawrence to execute the Promissory Note that allowed William to satisfy the $17.5 million purchase price by making annual interest-only payments (at 4%) to First Fiscal beginning in September 2026 until the maturity date in 2032. The Promissory Note also lacked customary lender protections for First Fiscal, including collateral security and restrictions on encumbrances against Broad Metro's assets.

12. Through this action, Plaintiffs seek rescission of the Transaction documents, including the Assignment of Membership Interests and Promissory Note, on the grounds that Lawrence's consent was obtained through William's undue influence and fraudulent inducement.

## THE PARTIES

13. Plaintiff Lawrence Kadish is an individual residing in Old Westbury, Nassau County, New York.

14. Plaintiff First Fiscal is a New York limited liability company whose principal place of business is located in Old Westbury, Nassau County, New York.

15. Upon information and belief, Defendant William Kadish is an individual residing in Birmingham, Alabama.

## JURISDICTION AND VENUE

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), based on the diversity of citizenship between the parties and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17. Plaintiff Lawrence Kadish resides in New York and is thus a citizen of New York.

18. Plaintiff First Fiscal is a New York limited liability company whose membership interests are entirely owned by citizens of New York. First Fiscal is thus a citizen of New York.

19. Upon information and belief, Defendant William Kadish resides in Alabama and is thus a citizen of Alabama.

20. Because Plaintiffs are citizens of a different state than Defendant, the parties are jurisdictionally diverse.

21. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391, because the Plaintiffs reside in this district and a substantial part of the events or omissions giving rise to the claims occurred here.

22. This Court has personal jurisdiction over the Defendant as the improper acts he allegedly committed occurred in Nassau County, New York, and the Defendant regularly conducts business in Nassau County, New York.

## COMMON ALLEGATIONS

23. Broad Metro was formed in or around 2012 as a limited liability company and, at the time, was solely owned by Lawrence.

24. Lawrence formed Broad Metro for legal and tax purposes to transfer ownership of real property located in Arizona, which had previously been owned by a different entity controlled by Lawrence.

25. By 2016, Broad Metro no longer owned any property in Arizona and was an assetless shell entity.

26. In or around early 2017, Lawrence and William agreed to enter into a joint venture to pursue an opportunity to purchase real property located in Alabama that was being offered for sale by U.S. Steel.

27. They agreed to utilize Broad Metro as the operating entity for the joint venture.

4911-9215-7079, v. 1

28. At that time, Lawrence gave William 50% of the membership interests in Broad Metro.

29. Under Broad Metro's Amended and Restated Operating agreement dated May 19, 2020, which states that it "supersed[es] and replac[es] any and all prior operating agreements for the Company," Lawrence was the sole managing member of Broad Metro and William was given limited authority to execute project agreements on behalf of the Company. The Amended and Restated Operating Agreement also formalized William's status as a 50% member of the company.

30. The authority given to the members recognized the respective roles of Broad Metro's members, with Lawrence serving as the sole source of capital funding for the Company and William providing operational management of the real estate development projects.

31. Consistent with that framework, in June 2017, Broad Metro opened its business checking accounts with TD Bank and only Lawrence had signatory authority.

32. On November 12, 2021, Broad Metro and William entered into a promissory note whereby Broad Metro loaned William $3 million. For all intents and purposes, this was a loan from Lawrence to William.

33. Although William was required to pay $60,000 per year in interest payments to Broad Metro, he never made a single payment.

34. On or about April 2022, Lawrence purchased a house for William in Birmingham Alabama for $1.4 million.

35. Without Lawrence's knowledge, William obtained a $1.1 million mortgage within one month of the home being purchased for him and, later, a second mortgage for $700,000 from Yieldi LLC, which is a hard money lender.

36. Also, between May 2022 and July 2025, Lawrence paid William over $750,000 to renovate his home.

37. In or about May 2023, Lawrence and William executed the First Amendment to Broad Metro's Amended and Restated Operating Agreement, which provided a mechanism for William to manage the Company in the event Lawrence became incapacitated, but did not otherwise grant William a role in managing the Company's finances.

38. Whenever changes to Broad Metro's operating agreements were made, Lawrence was adamant to limit William's authority in Broad Metro to non-financial operations only. This was due to William's troublesome financial and gambling history, as set forth further below.

39. For example, William was not permitted to directly access Broad Metro's bank account and was not a signatory thereon. William would have to call Lawrence's New York office to request any information relating to the bank account.

40. Moreover, between approximately 2012 and 2018, Lawrence hired a third-party accountant, Dana Marti of Marks Paneth, to monitor all of William's personal expenditures that Lawrence funded.

41. However, upon information and belief, in or about June 2024, Lawrence and William executed the Second Amendment to Broad Metro's Amended and Restated Operating Agreement that added William as a manager of the Company. Nevertheless, all banking transactions were required to obtain approval from Lawrence's New York office.

42. In connection with managing Broad Metro's real estate development projects, since approximately 2019, William submitted monthly check requests and other payment requests to Lawrence that were ostensibly to be used to fund Broad Metro's acquisitions, developments, renovations, and operating costs.

43. Lawrence, mostly through First Fiscal, paid these requests at William's behest in reliance upon William's representations that the payments related to Broad Metro.

44. Between approximately 2016 and 2025, such payments totaled over $25.8 million (previously defined as the "FF Funds").

45. However, there were certain items contained in the monthly check requests for FF Funds that William categorized as business expenses, but which (it was later discovered) William used to finance his personal expenses wholly unrelated to Broad Metro, including personal legal expenses, and, upon information and belief, the repayment of substantial debts and personal loans.

46. William also refused to provide back-up invoices, work orders, or any proof to substantiate the propriety of the monthly check requests. Because Lawrence believed he could trust his son and business partner to protect his best interests, Lawrence paid the check requests notwithstanding the lack of documentation.

47. For example, William managed the relationships with attorneys, contractors, and vendors for the Broad Metro real estate development projects. Lawrence had no communication or interaction with any of the contractors and vendors.

48. Some of the Broad Metro development projects included the same contractors as those providing work on William's personal residence.

49. In recent years, the monthly check requests William sent to Lawrence sought increasing amounts of money and demanded urgent payment. Upon information and belief, the timing of the increased demands for Broad Metro check payments coincided with the increase in William's problems.

4911-9215-7079, v. 1

50. For example, between approximately 2022 and 2025, William caused First Fiscal to pay, based on illegitimate Broad Metro check requests, approximately $350,000 to his personal lawyers in Alabama for litigation with his ex-girlfriend, unrelated to Broad Metro.

51. Upon information and belief, William needed to use a hard money lender because, due to his history of over-extending himself financially, he needed to seek unconventional methods of obtaining funds.

52. Suddenly, in or about early August 2025, despite having no funds or access to credit, William proposed to buy out Lawrence's membership interest in Broad Metro (the "Proposed Transaction").

53. Upon information and belief, at the time, William referenced an unspecified future litigation against Broad Metro and his desire to protect Lawrence from exposure to same.

54. In response, Lawrence expressly informed William—by letter dated August 8, 2025, which Lawerence or his office staff emailed to William on August 11, 2025—that the minimum compensation Lawrence would accept for his 50% membership interests in Broad Metro was "the recovery of my $25,000,000.00 investment (+ sharing of [Broad Metro's future] profits with you)."

55. On Labor Day, September 1, 2025—when, upon information and belief, William knew Lawrence would be without his office staff members who had the day off and without the immediate ability to consult his legal counsel—as the 92-year-old Lawrence was at home recovering from a recent bout of pneumonia and in frail health, William visited Lawrence under the guise of caring for his ill father, to again raise the Proposed Transaction.

56. William visited Lawrence while he was in his study with his wife, Susan, and the home health aides. Since Susan is very limited in function due to dementia and Parkinson's disease,

and the health aides are not familiar with business/legal matters, William was essentially alone with the aging and ailing Lawrence.

57. Lawrence did not agree to any Proposed Transaction at this time.

58. The next day, on or about September 2, 2025, William again visited Lawrence while Lawrence's staff was present. This time, William falsely informed Lawrence's staff that Lawrence had agreed to the Proposed Transaction the previous day (when no office staff was present). But Lawrence did not agree to it.

59. William further falsely informed Lawrence's staff that Lawrence agreed to accept a $17.5 million promissory note for his 50% Broad Metro membership interests, a far cry from the $25 million plus profit share Lawrence had demanded just weeks earlier. William also claimed that there were no tax consequences to Lawrence.

60. Lawrence's office staff informed William that any documentation concerning the Proposed Transaction should be emailed to Lawrence's office staff so it could be sent to Lawrence's attorneys for review.

61. In addition, Lawrence's tax advisor was going to review the documents and consider any tax consequences to Lawrence, as well as conduct due diligence concerning the value of Broad Metro and its assets.

62. As was customary for any transaction involving Lawrence's business interests, the office staff was aware that the transaction documents were required to be reviewed for legal and tax purposes.

63. That same evening, on September 2, 2025 at approximately 5:24 pm, William emailed Lawrence and his office staff copies of the Proposed Transaction Documents William's

legal counsel purportedly drafted, to wit, an Assignment of Membership Interests Agreement and a Promissory Note (the "Transaction Documents").

64. In the cover email attaching the Transaction Documents, William wrote:

> In accordance with your directions, attached is the share transfer document whereby you are transfering [*sic*] your 50 percent iinterest [*sic*] in Broad Metro LLC and I am undetaking [*sic*] the 2024 IRS reported debt owed by Broad Metro to First Fiscal Fund Co.
>
> This tax free transaction, will allow me to face upcoming littifation [*sic*] and keep such littigation [*sic*] linited [*sic*] to Alabama. Also you will be allowing me the flexibilitu [*sic*] to perform build to suit work for operators that will trigger inscentive [*sic*] agreements with two local Alabama municipalities and successfully complete the developments that I promised to these communities amd [*sic*] help make my dream of being a successful developer come true. You have agreed to funding of $600,000. [*sic*] (the last three months of 2025), asside [*sic*] from that anmuony [*sic*] I will be hereafter be reposnsoble [*sic*] for all Btoad [*sic*] Metro obligations. Your flexibility, generosity and kindess [*sic*] will always be appreciated by me.

65. In fact, Lawrence had agreed to none of the terms discussed in William's self-serving, September 2, 2025 email.

66. On or about the morning of September 3, 2025, Lawrence's office staff forwarded the Transaction Documents to Lawrence's attorneys for review.

67. The Transaction Documents were inequitable to Lawrence on their face. Among other things, they required Lawrence to relinquish his 50% Broad Metro membership interests to William for only $17.5 million, which was far below the $25.8 million in FF Funds that Lawrence contributed to Broad Metro. This amount also did not account for the additional potential appreciation in value of Broad Metro's real estate holdings.

68. In addition, the deal consisted of William giving Lawrence a promissory note instead of the cash Lawrence had originally demanded. According to Lawrence, any deal involving a promissory note from William was equivalent to "toilet paper."

69. Moreover, the Promissory Note allowed William to satisfy the $17.5 million purchase price by making annual interest-only payments (at 4%) to First Fiscal starting in September 2026, until the maturity date in 2032. As stated, the Promissory Note also lacked customary protections to the lender such as collateral security and restrictions on encumbrances against the assets of Broad Metro.

70. Before Lawrence's attorneys were able to opine on the Transaction Documents, consider the tax consequences, or conduct any valuation of Broad Metro, William strategically returned to Lawrence's home at 8:30 am on Thursday, September 4, 2025, which, as William knew, was a time prior to Lawrence's office staff being present, before Lawrence had an opportunity to become fully awake and alert, and before there was time for Lawrence's medications to take effect.

71. Upon information and belief, William then coerced Lawrence to execute the Transaction Documents by taking advantage of the deterioration of Lawrence's health and again misrepresenting that Lawrence had already agreed to the terms of the Transaction Documents.

72. William also presented the Transaction Documents to Lawrence as if they had been appropriately reviewed and approved, despite that Lawrence's attorneys were still reviewing them.

73. William had two nursing aides sign the documents as witnesses instead of following Lawrence's standard office procedure, which was to have members of Lawrence's office staff witness his signature in legal and financial documents.

74. Immediately after the execution of the Transaction Documents, Lawrence demanded that William return the documents as null and void. William refused to do so.

75. At the time that William purportedly obtained 100% of the membership interests in Broad Metro, the business was not encumbered by any debt.

76. However, in November 2025, William caused Broad Metro to enter into a $5.5 million loan agreement with Yieldi LLC, his go-to hard-money lender. The loan was cross-collateralized by multiple Broad Metro properties that had previously been debt-free.

77. Upon information and belief, William took control of Broad Metro in order to leverage its assets and pay off his personal debts.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Rescission of Assignment and Promissory Note Based on Fraud and Undue Influence)**

78. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

79. At all relevant times, Lawrence was over 90-years-old, physically frail, and recovering from pneumonia, which materially impaired his strength, stamina, and ability to resist pressure.

80. William is Lawrence's son who stood in a confidential and fiduciary relationship with Lawrence.

81. Lawrence and William were 50-50 members of Broad Metro, a closely-held family-owned limited liability company, and therefore owed fiduciary duties to one another.

82. Pursuant to the Second Amendment to the Amended and Restated Operating Agreement, William was designated as an additional managing member of Broad Metro, vesting him with control, authority, and access to information. Further, William maintained operational control over the real estate projects, the books and records and managed the tenants, vendors, and contractors for Broad Metro.

83. As a managing member, William owed Lawrence heightened fiduciary duties, including duties of loyalty, candor, and fair dealing.

84. As stated, since 2016, Lawrence, through First Fiscal, invested approximately $25.8 million in Broad Metro, including funds used for acquisitions, development, operating expenses, and William's salary.

85. In or about August 2025, William approached Lawrence regarding the purchase of Lawrence's 50% membership interest in Broad Metro.

86. At that time, Lawrence rejected any transaction that failed to reflect fair market value and expressly demanded repayment of $25 million in cash and a buyout for his participation in future profits. It was standard procedure in Lawrence's office that any proposed agreements were subject to review by Lawrence's legal counsel.

87. In or about September 2, 2025, William visited Lawrence and provided him with the Transaction Documents that William misrepresented reflected the terms of what they had already agreed upon.

88. However, while Lawrence's attorneys were reviewing the Transaction Documents, on September 4, 2025, William visited Lawrence again at his residence while Lawrence was physically frail, ill, and recovering from the after-effects of pneumonia. At that time, William presented the Transaction Documents: (i) the Assignment transferring Lawrence's 50% membership interest to William; and (ii) the Promissory Note under which William, as borrower, agreed to repay $17.5 million to First Fiscal, as lender.

89. As a means to induce Lawrence to sign the agreements, William misrepresented that the Assignment and Promissory Note merely memorialized the same terms they had purportedly agreed to, when in fact, the Assignment and Promissory Note William induced Lawrence to sign contained terms Lawrence never agreed to.

13

90. William further implored Lawrence that there was no further need for Lawrence's attorney to review the agreements, insisting Lawrence could and should execute them immediately.

91. Those misrepresentations were false and misleading and were made with knowledge of their falsity and with the intent to induce Lawrence's reliance thereon.

92. In fact, the agreements materially departed from the terms Lawrence had previously demanded and discussed, including, inter alia, by: (i) reducing the repayment amount by millions of dollars; (ii) eliminating any right to future profit participation; (iii) deferring interest payments until September 2026; (iv) imposing only minimal annual interest-only payments; and (v) applying a below-market interest rate of 4% with a maturity date in 2032.

93. The Assignment and Promissory Note were presented together, executed contemporaneously, and constituted a single integrated transaction.

94. Both agreements were undated but made effective retroactively as of January 1, 2025, which was also a material departure from the terms William had previously discussed with Lawrence.

95. The Promissory Note was executed by William, as borrower, and Lawrence, on behalf of First Fiscal, as lender.

96. Lawrence did not receive the assistance of counsel to review the agreements.

97. William did not disclose the fair market value of Broad Metro, did not provide financial statements or valuations, and did not disclose the material unfairness of the Transaction.

98. William knowingly exploited: (i) Lawrence's advanced age and physical infirmity; (ii) Lawrence's trust in William as his son, business partner, and fiduciary; (iii) William's

dominant position as a managing member and knowledge of the business operations; and (iv) Lawrence's reliance on William's representations concerning the substance of the agreements.

99. William's conduct constituted undue influence, carried out by coercion.

100. Alternatively, William's conduct constituted fraud, including affirmative misrepresentations and material omissions made in breach of fiduciary duty.

101. In reliance thereon, and while vulnerable, Lawrence executed the Assignment and Promissory Note without independent legal counsel.

102. Accordingly, the Assignment and Promissory Note were not the product of Lawrence's free, voluntary, and informed consent, but rather William's undue influence and fraudulent inducement.

103. Equity therefore requires that both agreements be rescinded and declared void ab initio, and that the parties be restored to the statute quo ante.

104. Based on the foregoing, Plaintiffs seek an Order to rescind the Assignment and Promissory Note; declare the Assignment and Promissory Note void and unenforceable; restore Lawrence's 50% membership interest in Broad Metro; and grant such other and further relief as the Court deems just and proper.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Constructive Trust)**

105. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

106. A confidential and fiduciary relationship existed between Lawrence and William based on their familial relationship, co-ownership of Broad Metro, and William's role as a managing member.

107. William expressly and impliedly promised to act in Lawrence's best interests and not to appropriate Lawrence's ownership interests.

108. In reliance on those promises and fiduciary obligations, Lawrence purportedly transferred his 50% membership interest in Broad Metro to William.

109. William obtained that transfer through undue influence, breach of fiduciary duty, and inequitable conduct, and has been unjustly enriched.

110. William now holds Lawrence's former membership interest in Broad Metro and controls Broad Metro's assets and income under circumstances rendering it inequitable for him to retain those benefits.

111. Based on the foregoing, Plaintiffs demand relief for the imposition of a constructive trust in order to preserve the assets of Broad Metro, prevent dissipation, and restore the parties to their equitable positions.

112. Accordingly, Plaintiffs seek an Order to impose a constructive trust over Lawrence's former membership interest in Broad Metro and its assets; require William to hold such interests and proceeds in trust for Lawrence; direct an accounting of all income, profits, and distributions; and award such further equitable relief as the Court deems just and proper.

## AS AND FOR THE THIRD CAUSE OF ACTION
(Accounting)

113. Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

114. As a former 50% owner of Broad Metro (who is also seeking to return to that status due to fraud), Lawrence is entitled to an equitable accounting as a result of the fiduciary duties he was owed by William.

115. William exercised managerial control in derogation of Lawrence's ownership rights.

116. An accounting is necessary to determine how much of the FF Funds (and other Broad Metro assets) William improperly obtained under false pretenses.

16

117. William has not accounted for his acts as Broad Metro's fiduciary to date.

**WHEREFORE**, Plaintiffs demand judgment in their favor, as follows: (a) on the first cause of action an Order to rescind the Assignment and Promissory Note; declare the Assignment and Promissory Note void and unenforceable; restore Lawrence's 50% membership interest in Broad Metro; and grant such other and further relief as the Court deems just and proper; (b) on the second cause of action, an Order to impose a constructive trust over Lawrence's former membership interest in Broad Metro and its assets; require William to hold such interests and proceeds in trust for Lawrence; direct an accounting of all income, profits, and distributions; and award such further equitable relief as the Court deems just and proper; (c) on the third cause of action, an Order for William to account for the monies of Broad Metro since September of 2025; and (d) for such other and further relief as the Court deems just and proper in the circumstances.

Dated: Mineola, New York
March 12, 2026

          **MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP**

          ***/s/ Stephen W. Livingston***
          Stephen W. Livingston, Esq.
          Robert S. Plosky, Esq.
          190 Willis Avenue
          Mineola, New York 11501
          (516) 747-0300
          slivingston@meltzerlippe.com
          rplosky@meltzerlippe.com